IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

DANIEL T. JOHNSON,                )
                                  )
                Plaintiff,        )
                                  )
        v.                        )   Case No. 10-0516-CV-SJ-REL-SSA
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
                Defendant.        )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Daniel T. Johnson, seeks review of the final
decision of the Commissioner of Social Security denying
Plaintiff's application for disability benefits under Title II of
the Social Security Act (Act), 42 U.S.C. §§ 401, et seq. (Tr.
53-58). Plaintiff raises these specific issues:

1.  Whether the ALJ's determination regarding Plaintiff's
    credibility is supported by substantial evidence;

2.  Whether the ALJ properly determined that Plaintiff did
    not meet the requirements for listing § 3.02, chronic
    pulmonary insufficiency;

3.  Whether the ALJ properly assessed Plaintiff's residual
    functional capacity (RFC); and

4.  Whether the ALJ's hypothetical question to the
    vocational expert constituted substantial evidence in
    support of the ALJ's determination at step five of the
    sequential evaluation process.

I find that the ALJ did not err. Therefore, Plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

### I.  BACKGROUND

This suit involves an application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, et seq. (Tr. 53-58). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II.

Plaintiff's application was denied initially (Tr. 40-44). On October 1, 2008, following a hearing, an ALJ issued a decision in which he found that Plaintiff was not under a "disability" as defined in the Social Security Act at any time when he met the earnings requirements of the law (Tr. 5-15). On March 19, 2010, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 1-4). Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

### II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's

decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Griffon v. Bowen</u>, 856 F.2d 1150, 1153-54 (8th Cir. 1988); <u>McMillian v. Schweiker</u>, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## *IV.  THE RECORD*

The record consists of the testimony of Plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

### *A.  ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### 1.  Earnings Record

Plaintiff's earnings record (Tr. 60) shows the following income for the years indicated:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $ 2,010.22 | 1993 | $ 6,140.11 |
| 1977 | 2,930.24 | 1994 | 4,593.27 |
| 1978 | 648.77 | 1995 | 11,363.00 |
| 1979 | 1,295.76 | 1996 | 10,823.41 |
| 1980 | 2,289.87 | 1997 | 2,367.51 |
| 1981 | 1,838.04 | 1998 | 6,373.02 |
| 1982 | 253.50 | 1999 | 7,705.54 |
| 1983 | 3,445.00 | 2000 | 7,496.79 |

| 1984 | 2,775.00 | 2001 | 17,515.08 |
|------|----------|------|-----------|
| 1985 | 18,219.00 | 2002 | 17,247.80 |
| 1986 | 4,152.38 | 2003 | 672.40 |
| 1987 | 1,784.89 | 2004 | 0.00 |
| 1988 | 2,436.45 | 2005 | 0.00 |
| 1989 | 959.00 | 2006 | 0.00 |
| 1990 | 518.46 | 2007 | 0.00 |
| 1991 | 1,120.00 | 2008 | 0.00 |
| 1992 | 1,055.63 | | |

## 2. Job Objective Evaluation/Vocational Evaluation Report

Between February 6, 2006, and February 21, 2006, Plaintiff was seen at the Rehabilitation Institute of Kansas City, in St. Joseph, Missouri, for developing a vocational plan leading to employment (Tr. 75-79). During this evaluation, Plaintiff indicated that he had an appointment to discuss his eligibility for Social Security benefits (Tr. 77). The Institute stated: "Should he be unable to qualify, Mr. Johnson will require assistance in identifying resources to sustain his self-sufficiency" (Tr. 77).

Plaintiff requested assistance from the Institute for physical disabilities and educational limitations that have limited his job choices (Tr. 75). Although Plaintiff reported physical ailments and limitations, the Institute did not do any independent testing to confirm these complaints (Tr. 75).

The Institute's evaluations focused on Plaintiff's academic achievement and aptitude as well as his reasoning and mechanical abilities (Tr. 77-78). The Institute reported that Plaintiff reads and comprehends at a post high-school level but he has low number operation skills (Tr. 77). Plaintiff scored above average in vocabulary and reading comprehension; average in language and problem solving; low average in spelling and total language; and below average in number operations and total mathematics (Tr. 78).

After undergoing the job evaluation, the Institute recommended that the Plaintiff pursue the vocational goal of cook. Plaintiff reportedly planned to secure part-time work due to his emphysema and asthma, which he represented as significantly reducing his stamina (Tr. 79).

### 3. Consultative Examination

On May 23, 2006, Dr. Sreenadha Davuluri, a neurologist, performed a consultative evaluation at the request of the agency (Tr. 225-30).

Plaintiff reported he suffered from chronic obstructive pulmonary disease ("COPD") and emphysema,[1] and he had a stroke in

---

[1]Emphysema occurs when the air sacs in your lungs are gradually destroyed, making you progressively more short of breath. Emphysema is one of several diseases known collectively as chronic obstructive pulmonary disease ("COPD"). Smoking is the leading cause of emphysema.
http://www.mayoclinic.com/health/emphysema/DS00296

2002, leaving him with weakness in his left arm (Tr. 225). Plaintiff indicated he was smoking one and a half packs of cigarettes a day. Plaintiff weighed 279 pounds (Tr. 227).

On physical exam, Plaintiff's range of motion of the cervical spine was limited and painful. Range of motion of the lumbar spine was limited. Dr. Davuluri noted Plaintiff had an abnormal gait and walked with a slow gait and was unable to walk on his heels and toes. Sensation to pin prick was decreased in the left C5 and C6 regions and left lower extremity below the knee (Tr. 229).

Dr. Davuluri diagnosed cervical disc disorder with myelopathy[2] and cerebral thrombosis [blood clot] with cerebral infarction.[3] On examination, the doctor noted Plaintiff had hyperreflexia[4] and minimal weakness of his left upper extremity. The doctor suspected Plaintiff had a combination of small lacunar

---

[2]Any functional disturbance and/or pathological change in the spinal cord.

[3]A cerebral infarction, or stroke, happens when blood flow to a part of the brain is interrupted because a blood vessel in the brain is blocked or bursts open.

[4]Disordered response to stimuli characterized by exaggeration of reflexes.

infarct[5] in the right centrum semiovale region[6] and cervical myelopathy[7] (Tr. 230).

The doctor observed that Plaintiff was able to handle buttons and use small tools and parts and use a peg board. Plaintiff was able to walk, lift and carry. The doctor concluded that Plaintiff's bigger problems were COPD and shortness of breath (Tr. 230).

## B. *SUMMARY OF MEDICAL RECORDS*

On July 20, 2002, Plaintiff reported to the emergency room at Heartland Health concerned that he might be having a stroke and complaining about left hand weakness and a recent headache that had since improved (Tr. 137-38, 179, 183-84). Physical examination revealed his cranial nerves were grossly intact but he had mild weakness in the left arm and his left grip was mildly weak compared to the right. Sreenadha Davuluri, M.D., a

---

[5]A type of stroke that results from occlusion of one of the penetrating arteries that provides blood to the brain's deep structures.

[6]The great mass of white matter comprising the interior of the cerebral hemisphere. The white matter is underneath the gray matter on the surface of the cerebrum.

[7]Cervical myelopathy is an injury to the spinal cord. The spinal cord is the primary nerve that sends motor and sensory input to the extremities, bladder and vital organs. Cervical myelopathy may result in loss of function to one or more of these recipients depending on where the injury is located. There are seven cervical vertebrae starting at the base of the skull and extending down through the neck.

neurologist, suspected a lacunar infarct[8] and ordered a magnetic
resonance imaging ("MRI") (Tr. 184). A computed tomography ("CT")
scan of Plaintiff's head was negative (Tr. 180). An MRI of
Plaintiff's head was unremarkable - it showed no evidence of
infarct,[9] hemorrhage,[10] or obstruction (Tr. 136). Plaintiff was
discharged in stable condition with a final diagnosis of
cerebrovascular accident ("CVA").[11] Plaintiff was instructed to
follow up with neurology in two to four weeks (Tr. 185).

On August 14, 2002, Plaintiff went to the emergency
department at Heartland Health and reported tingling, numbness,
and weakness all over his body (Tr. 174-77). A repeat MRI of
Plaintiff's brain was negative - it showed no evidence of stroke
or abnormalities (Tr. 177). Plaintiff was put on Aggrenox
[aspirin]. Plaintiff was discharged and instructed to follow-up
with Dr. Sreenadha Davuluri. Clinical impression was generalized

---

[8]A type of stroke that results from occlusion of one of the
penetrating arteries that provides blood to the brain's deep
structures.

[9]A localized area of dead tissue (necrosis) resulting from
obstruction of the blood supply to that part, especially by an
embolus - something that travels through the bloodstream, lodges
in a blood vessel and blocks it. Examples of emboli are a
detached blood clot, a clump of bacteria, and foreign material
such as air.

[10]Profuse bleeding.

[11]The sudden death of some brain cells due to lack of oxygen
when the blood flow to the brain is impaired by blockage or
rupture of an artery to the brain. A cerebrovascular accident is
also referred to as a stroke.

numbness, tingling and weakness all over the body with exact cause undetermined; and history of recent CVA (Tr. 174-77).

On August 27, 2002, Plaintiff went to Dr. Sreenadha Davuluri complaining of neck pain and numbness (Tr. 140). An MRI of the cervical spine revealed no abnormality (Tr. 140).

On August 29, 2002, Plaintiff underwent a chest x-ray which showed clear lungs except for calcified granulomata and streaky linear densities in the left lung base (Tr. 173). CT was recommended to rule out underlying mass lesions if previous studies were not available for comparison (Tr. 173). Plaintiff reported a history of smoking (Tr. 173).

On September 3, 2002, a chest CT showed mild hyperinflation of the lungs with a few small cystic changes predominantly in the upper lobes and a possible small nodule (Tr. 171-72). Because Plaintiff then had a "history of smoking tobacco abuse," the doctor recommended follow up in two months (Tr. 171).

On December 4, 2002, Plaintiff underwent a chest CT which revealed a "very small" calcified granuloma (Tr. 169).

On December 16, 2002, Plaintiff reported to the emergency room with itching, afraid that he was having an allergic reaction to his daughter's perfume (Tr. 166). Gary Daniels, M.D., gave Plaintiff medication and the itching decreased significantly; the doctor also observed that Plaintiff's breathing sounds were normal (Tr. 167).

On April 9, 2003, Plaintiff reported to the emergency room at Heartland Health with back pain (Tr. 163). Physical exam revealed diffuse lower lumbar tenderness. An x-ray showed mild degenerative change but was otherwise negative (Tr. 164). William Gummelt, M.D., a family practitioner, diagnosed back strain and provided Plaintiff with medication (Tr. 164).

On April 29, 2003, after viewing an MRI of Plaintiff's right shoulder, Jack Bridges, M.D., thought a full thickness rotator cuff tear was likely, but found no other significant abnormality (Tr. 162).

On May 22, 2003, Bruce Smith, M.D., performed shoulder surgery. Postoperative diagnoses were impingement syndrome,[12] torn right rotator cuff, and acromioclavicular[13] arthritis (Tr. 160-61).

On October 15, 2003, Plaintiff went to John R. McKinney, D.O., an emergency medicine specialist, complaining of a knot under his left arm (Tr. 153-55). Examination showed no obvious mass, no impact on Plaintiff's strength or range of motion, and a chest x-ray showed no obvious active disease (Tr. 154). Dr. McKinney diagnosed nonspecific, nonacute left axilla pain and

---

[12]When you raise your arm to shoulder height, the space between the acromion and rotator cuff narrows. The acromion can rub against (or "impinge" on) the tendon and the bursa, causing irritation and pain.

[13]The shoulder/collar bone.

provided medication (Tr. 155).

On April 1, 2004, Nancy Brecheisen, M.D., of Heartland Health Pulmonary and Critical Care, reported that she had evaluated Plaintiff in the Pulmonary Clinic that day. The doctor noted Plaintiff was winded with any exertion and was out of Combivent.[14] Plaintiff was smoking one to one and a half packs of cigarettes per day. Physical exam revealed decreased breath sounds and trace edema in the extremities. Chest x-rays showed no significant interval change when compared with a previous study. Dr. Brecheisen assessed chronic obstructive pulmonary disease with worsening symptoms off medications; emphysema; history of bronchospastic component in the past; persistent tobacco use; questionable pulmonary nodule, though not then readily visible; and overweight with chest restriction with 20 pound weight gain in the past year and a half. The doctor recommended that Plaintiff stop smoking and lose weight. In addition the doctor advised Plaintiff to resume Combivent and add Serevent[15] (Tr. 223-24).

On July 12, 2004, Plaintiff went to Steven Buckles, D.O., and reported left wrist pain and left leg pain. On physical exam, Plaintiff weighed 264 pounds. Plaintiff had localized swelling in his left wrist and range of motion was decreased and painful.

---

[14]Treats chronic obstructive pulmonary disease.

[15]A slow-acting bronchodilator.

13

Plaintiff's left ankle revealed generalized swelling with decreased and painful range of motion. Dr. Buckles assessed myalgia[16] and myositis,[17] unspecified; and neuralgia,[18] neuritis,[19] and radiculitis,[20] unspecified. The doctor prescribed Cataflam[21] (Tr. 200-01).

On July 26, 2004, Plaintiff returned to Dr. Buckles claiming he was "not doing much better" (Tr. 198-99). Plaintiff continued to have swelling along with decreased and painful range of motion in his left wrist and ankle (Tr. 198-99). X-rays were negative, so Dr. Buckles suggested an appointment with an orthopedist (Tr. 199).

On November 2, 2004, Plaintiff was admitted to Heartland Health with palpitations and chest pain (Tr. 143-44). Plaintiff reported he had chronic dyspnea[22] on exertion. On examination, Plaintiff's breath sounds were decreased and there were a few

---

[16]Pain in a group of muscles.

[17]Swelling of the muscles.

[18]An intense burning or stabbing pain caused by irritation of or damage to a nerve.

[19]Inflammation of a nerve or group of nerves, characterized by pain, loss of reflexes, and atrophy of the affected muscles.

[20]Inflammation of the spinal nerve roots.

[21]A non-steroidal anti-inflammatory.

[22]Shortness of breath.

14

wheezes[23] and rhonchi.[24] The assessment was palpitations, chest
pain atypical for angina,[25] and chronic obstructive lung disease
with an acute exacerbation. It was recommended Plaintiff be
observed for arrhythmias to rule out myocardial infarction[26] (Tr.
147-49). Exercise stress echocardiogram was normal (Tr. 212).
David G. Ward, M.D., an emergency medicine specialist, diagnosed
bronchitis and chest pain, and gave Plaintiff aspirin and
nitroglycerin, along with other medications (Tr. 144, 150). The
doctor thought that Plaintiff's symptoms might be due to
over-the-counter medication that Plaintiff had taken (Tr. 144).

On November 16, 2004, Plaintiff went to Steve Buckles, D.O.,
for follow-up after his hospitalization. Plaintiff reported
shortness of breath, cough, fatigue, and night sweats. Plaintiff
weighed 273 pounds. Dr. Buckles noted that Plaintiff's lungs were
normal, with no adventitious sounds[27] (Tr. 196-97). Dr. Buckles

---

[23]To breathe with difficulty, producing a hoarse whistling
sound.

[24]A sound like whistling or snoring that is heard with a
stethoscope during expiration as air passes through obstructed
channels.

[25]Angina is pain, "discomfort," or pressure localized in the
chest that is caused by an insufficient supply of blood
(ischemia) to the heart muscle. It is also sometimes
characterized by a feeling of choking, suffocation, or crushing
heaviness. This condition is also called angina pectoris.

[26]Heart attack.

[27]Abnormal sounds such as rales or rhonchi.

assessed acute bronchitis and mixed hyperlipidemia[28] (Tr. 196-97).

On December 7, 2004, Plaintiff told Nancy Brecheisen, M.D., in the Pulmonary Clinic that he had stopped smoking (Tr. 221-22). Dr. Breicheisen observed that Plaintiff got short of breath if he walked fast, but was otherwise "feeling well;" and Plaintiff reported that he felt "markedly improved" since he stopped smoking (Tr. 221). Dr. Brecheisen diagnosed COPD; dyspnea, improved; and significant tobacco abuse in the past, now with smoking cessation (Tr. 222).

On February 15, 2005, Steve Buckles, D.O., saw Plaintiff for hypertension. His blood pressure was 168/90. Plaintiff also complained of a knot on his right wrist. Dr. Buckles assessed benign essential hypertension; mixed hyperlipidemia; and ganglion[29] and cyst of synovium, tendon, and bursa. The doctor prescribed Diovan[30] (Tr. 194-95). Plaintiff reported that he smoked one and one half packs of cigarettes per day (Tr. 192-93).

On April 12, 2005, Plaintiff returned to Steve Buckles, D.O., for follow-up on his hypertension. Plaintiff weighed 274 pounds. Plaintiff reported he smoked 1.5 packs of cigarettes per

---

[28]High cholesterol.

[29]A ganglion is a small, usually hard bump above a tendon or in the capsule that encloses a joint. A ganglion is also called a synovial hernia or synovial cyst.

[30]Treats high blood pressure.

day (Tr. 192-93). Plaintiff noted that he was "doing great on the medication" (Tr. 192). Plaintiff's lungs were normal (Tr. 193).

On July 13, 2005, Plaintiff went to Steve Buckles, D.O., for follow-up on lab results. Dr. Buckles noted Plaintiff's triglycerides were going up and his liver enzymes were up despite his Lipitor. The doctor instructed Plaintiff to stop Lipitor and watch his diet (Tr. 190-91). Dr. Buckles observed that Plaintiff was "doing pretty good" (Tr. 190).

On October 5, 2005, Plaintiff saw Nancy Brecheisen, M.D., and reported that he was smoking one to two packs of cigarettes again (Tr. 82, 219-20). Dr. Brecheisen diagnosed severe obstructive lung disease with air trapping and low diffusion, "likely secondary to [Plaintiff's] one to two packs a day tobacco use" (Tr. 82-83, 219-20). Spirometry testing showed an forced expiration volume (FEV1)[31] of 1.75 pre-bronchodilator and 2.23 post-bronchodilator (Tr. 216-17). Pulmonary function tests (PFTs) revealed severe obstructive lung disease with air trapping and low diffusion. Plaintiff weighed 270 pounds and his lungs had diminished breath sounds (Tr. 216). Plaintiff's extremities

---

[31]FEV1 is the maximal amount of air one can forcefully exhale in one second. It is then converted to a percentage of normal. For example, an FEV1 may be 80% of predicted based on the patient's height, weight, and race. FEV1 is a marker for the degree of obstruction with asthma:
FEV1 greater 80% of predicted= Normal
FEV1 60% to 79% of predicted = Mild obstruction
FEV1 40% to 59% of predicted = Moderate obstruction
FEV1 less than 40% of predicted = Severe obstruction

revealed 1+ edema. Chest x-rays revealed his heart size was in the upper limits of normal. No current pulmonary nodules were seen. Dr. Brecheisen's impression was history of small pulmonary nodules seen on CT in 2002 with no significant change on chest x-ray over a three year period; and COPD with persistent shortness of breath, likely secondary to tobacco use. The doctor discussed with Plaintiff the need for smoking cessation and told him he should be placed on antibiotics due to his severe disease if he develops a COPD exacerbation (Tr. 219-20). Dr. Brecheisen urged Plaintiff to stop smoking and Plaintiff said he would "take it under advisement" (Tr. 220).

On April 24, 2006, Plaintiff reported to the emergency room with chest pain and shortness of breath (Tr. 380-81). A chest x-ray that day revealed chronic lung disease with no acute process (Tr. 386). Lynthia Andrews, D.O., an emergency medicine specialist, diagnosed acute bronchitis and gave Plaintiff antibiotics and an inhaler; she noted that Plaintiff's condition was "stable" on discharge (Tr. 380-81).

On June 4, 2006, Plaintiff went to the emergency department at Heartland Health reporting chest pain and shortness of breath. The impression was acute bronchitis and chest wall myositis.[32] Plaintiff was given a Ventolin inhaler and told to continue his medications (Tr. 380-81).

---

[32]Swelling of the muscles.

On July 29, 2006, a lumbar MRI showed a small, left-sided disk protrusion, a large vertebral hemangioma[33] replacing most of L1, and a small left-sided disk herniation at L3-L4 (Tr. 388-89).

On September 6, 2006, Plaintiff underwent a single session of physical therapy claiming that he was having pain into the left side of his buttocks and leg, noting that he had had back problems for about 15 years (Tr. 255).

On October 19, 2006, Nancy Brecheisen, M.D., reported that she examined Plaintiff in the Pulmonary Clinic. Plaintiff reported he was becoming more short of breath. Dr. Brecheisen noted that Plaintiff knew he needed to stop smoking, but he had so much pain that he had been chain smoking. Plaintiff weighed 285 pounds. Physical exam revealed markedly diminished breath sounds with very end expiratory squeaks. Plaintiff's extremities exhibited 1+ edema. Dr. Brecheisen's impression was COPD with worsening shortness of breath likely exacerbated by smoking one and a half packs of cigarettes per day. The doctor told Plaintiff to cut back on his tobacco use because every cigarette worsened his wheezing and shortness of breath. The doctor continued Combivent and prescribed Advair (Tr. 299-300).

On November 2, 2006, Plaintiff reported to the emergency room complaining of eye pain; Plaintiff was using a drill on wood and suspected that sawdust had gotten into his eye (Tr. 377).

_____

[33]A benign or malignant vascular tumor.

Catherine White, D.O., diagnosed Plaintiff with corneal abrasion (Tr. 378).

On November 30, 2006, Plaintiff underwent pulmonary function test studies with Nancy Brecheisen, M.D. The procedure was limited due to patient effort. Spirometry revealed a severe limitation in FEV1 with FEV1 of 1.42 or 32% of predicted (see footnote 31). There was a modest response with bronchodilatoruse, with FEV1 increase to 1.48, a 4% change. The lung volumes revealed a mixed mild restrictive process with a total lung capacity of 69% of predicted. There was a concomitant obstructive process with a residual volume that was also elevated at 148% of predicted. The airway resistance was elevated. When compared with a previous study of October 2005, FEV1 had decreased from 1.75 to 1.42 and total lung capacity had diminished. There was not as much of a bronchodilator response (Tr. 307-09). Dr. Brecheisen reported that Plaintiff's responsiveness to bronchodilators had dropped. Plaintiff had diminished lung volume as well as increased airway resistance. Dr. Brecheisen noted "mild restrictive and moderate to severe obstructive process," though diffusion capacity was within normal limits (Tr. 375). The doctor noted Plaintiff had cut back to one pack of cigarettes a day. The doctor added an Acapella valve[34] and continued Combivent (Tr.

---

[34]The Acapella Flutter Valve is a portable device that helps the lungs function. Its main use is to help keep the lungs clear of mucous by using positive pressure and also vibration. It is

297-98).

On December 26, 2006, Plaintiff was hospitalized at Heartland Health for pneumonia. Annette Smith, M.D., performed pulmonary consultation. Chest x-ray showed atelectasis[35] versus infiltrate in the left base, along with a small left pleural effusion.[36] Dr. Smith noted Plaintiff had smoked since approximately the age of six or seven and currently smoked from one to one and a half packs of cigarettes a day. Physical exam revealed a harsh barking cough and wheezing on the anterior right lung. Dr. Smith assessed pneumonia,[37] pleurisy,[38] small left pleural effusion and tobacco abuse (Tr. 310-12). Plaintiff told Dr. Andrews that he had stopped taking his steroids, but "now he thinks he probably should have kept taking it because it probably was helping him some" (Tr. 359-60).

---

mainly used by patients who have cystic fibrosis and COPD.

[35]Atelectasis is a collapse of lung tissue affecting part or all of one lung. This condition prevents normal oxygen absorption to healthy tissues.

[36]Pleural effusion occurs when too much fluid collects in the pleural space (the space between the two layers of the pleura). It is commonly known as "water on the lungs." It is characterized by shortness of breath, chest pain, gastric discomfort (dyspepsia), and cough.

[37]Pneumonia is an infection of the lung that can be caused by nearly any class of organism known to cause human infections.

[38]Pleurisy is an inflammation of the membrane that surrounds and protects the lungs (the pleura).

On December 27, 2006, a chest x-ray revealed chronic lung disease with right middle lobe infiltrate, which appeared to be increased or new from the previous day's study. Left lung base was clear (Tr. 302).

On December 29, 2006, Plaintiff was discharged from Heartland Health with medications of Combivent, Diovan, Levaquin, Medrol Dosepak, Tylenol 500, and Albuterol (Tr. 367).

On January 31, 2007, Nancy Brecheisen, M.D., saw Plaintiff to follow up on his recent hospitalization (Tr. 295). Dr. Brecheisen reported Plaintiff's then-current medications included DuoNeb, Diovan, and Combivent. Plaintiff weighed 291 pounds. Plaintiff said he was smoking a pack to a pack and a half each day. Plaintiff said when he tried to stop, his nerves get "shot" and he snaps at everyone. On physical examination, Plaintiff had diminished breath sounds. Dr. Brecheisen assessed COPD with recent exacerbation, improved after hospitalization; concomitant restrictive lung disease; persistent heavy tobacco use. The doctor planned to try Nicotrel inhaler to attempt to crease Plaintiff's nicotine dependence (Tr. 295-96).

On March 29, 2007, Plaintiff met with Nancy Brecheisen, M.D., (Tr. 293). Plaintiff reported that he had cut back to six to eight cigarettes a day and he was "breathing fairly well," but he had had "terrible mood swings" when he was off cigarettes (Tr.

293). The doctor congratulated Plaintiff on tapering his tobacco use and told him to return in six months (Tr. 294).

On May 21, 2007, Plaintiff went to the emergency department at Heartland Health with shortness of breath (Tr. 352). Physical exam revealed decreased aeration throughout the lungs with faint wheezes and scattered rhonchi. Chest x-ray revealed no acute cardiopulmonary disease process. The impression was COPD exacerbation, bronchitis, and tobacco abuse. Plaintiff was discharged with prescriptions for prednisone and doxycycline (an antibiotic) (Tr. 352-53).

On June 29, 2007, Plaintiff saw neurologist Mignon Makos, M.D., complaining of low back pain (Tr. 259-261). Plaintiff reported that he was trying to remodel his home and had difficulty; and he added that he had been told at physical therapy that he should use a cane and restrict his lifting (Tr. 259). Dr. Makos observed that Plaintiff waddled and had an impaired gait (Tr. 260). Dr. Makos recommended epidural steroid injections, but Plaintiff said he was not interested (Tr. 259).

On July 5, 2007, Plaintiff underwent a sleep study (Tr. 257-58). Assessment was severe obstructive sleep apnea[39] with

---

[39]Sleep apnea is a chronic medical condition where the affected person repeatedly stops breathing during sleep. These episodes last 10 seconds or more and cause oxygen levels in the blood to drop. Obstructive sleep apnea is caused by obstruction of the upper airway.

apnea/hypopnea index[40] of 39; and excessive body mass index (BMI) of 37.1. Dr. Brecheisen recommended Plaintiff lose weight. In addition, the doctor advised initiation of CPAP[41] at 8cm, but it may need to be increased up to CPAP of 12 if Plaintiff was not able to catch his breath. The doctor noted Plaintiff had more arousals and could not reach REM-related sleep at CPAP of 12, which made this an incomplete study (Tr. 257-58).

On July 13, 2007, Plaintiff had an MRI of the brain to evaluate hyperreflexia.[42] Results revealed no abnormally enhancing lesions, no intraparenchymal signal abnormality, and no evidence of acute infarct (see footnote 9) (Tr. 262-63). Lumbar spine x-ray revealed mild scoliosis,[43] but was otherwise

─────────────

[40]Apnea-hypopnea index, or AHI, is an index used to assess the severity of sleep apnea based on the total number of complete cessations (apnea) and partial obstructions (hypopnea) of breathing occurring per hour of sleep. These pauses in breathing must last for 10 seconds and are associated with a decrease in oxygenation of the blood. In general, the AHI can be used to classify the severity of disease (mild 5-15, moderate 15-30, and severe greater than 30).

[41]CPAP, or continuous positive airway pressure, is a type of noninvasive ventilation sometimes used during COPD treatment, particularly at night when oxygen saturation levels in some COPD patients tend to drop.

[42]An exaggerated response of the deep tendon reflexes, usually resulting from injury to the central nervous system or metabolic disease.

[43]When viewed from the rear, the spine usually appears perfectly straight. Scoliosis is a lateral (side-to-side) curve in the spine, usually combined with a rotation of the vertebrae. (The lateral curvature of scoliosis should not be confused with the normal set of front-to-back spinal curves visible from the

unremarkable (Tr. 264). MRI revealed no evidence of an occlusion[44] or aneurysm[45] (Tr.265). Cervical spine x-rays revealed mild degenerative changes (Tr. 267). Thoracic spine x-rays revealed mild scoliosis and degenerative changes (Tr. 268). MRI of the thoracic spine revealed the midthoracic cord was displaced anteriorly by what was either an acquired ventral dural defect with cord herniation or an arachnoid cyst (Tr. 269-70). MRI of lumbar spine revealed no change from July 29, 2006; at L3-4, small lateral disc protrusion into left lateral recess (Tr. 271-72).

On July 30, 2007, Plaintiff went to Brent Peterson, D.O., of Heartland Neurosurgery, and reported pain from his shoulders, down his back to his buttocks and into his hips and left leg (Tr.416). Examination revealed left sided grip was weak and left shoulder was lower than the right. He had decreased range of motion in the cervical and lumbar spine, and there was tenderness to palpation in the cervical and thoracic spine. Dr. Peterson assessed neck pain, thoracic pain, and brisk reflexes; prescribed

---

side.) While a small degree of lateral curvature does not cause any medical problems, larger curves can cause postural imbalance and lead to muscle fatigue and pain.

[44]An obstruction or a closure of a passageway or vessel.

[45]A localized widening (dilatation) of an artery or vein. At the area of an aneurysm, there is typically a bulge and the wall is weakened and may rupture.

Ultram,[46] and discussed the use of Chantix to address Plaintiff's

tobacco abuse (Tr. 420-22).

On August 1, 2007, Plaintiff underwent complete myelogram.[47]

The visualized cervical cord appeared unremarkable, with no

clear-cut nerve root amputation (Tr. 336). Thoracic CT revealed

an arachnoid cyst.[48] (Tr. 334-35). Cervical CT revealed the C5-6

disc space demonstrated osteophytes[49] and disc material impinging

upon the canal; there was mild deformity of the right side of the

cord; and chronic posttraumatic changes of the superior end-plate

of C7 (Tr. 333-34).

On August 6, 2007, Plaintiff returned to Brent Peterson,

D.O., stating that "he has not had any reduction in pain except

---

[46]A narcotic-like pain reliever used to treat moderate to
severe pain.

[47]An x-ray of the spinal cord and the bones of the spine.
During a myelogram, a contrast material that is injected into the
spinal canal is used to visualize the structures of the spinal
cord and nerve roots.

[48]One of the membranes that sheathes the spinal cord and
brain; the arachnoid is the second-layer membrane.

[49]Osteophytes, or bone spurs, are bony projections that form
along joints, and are often seen in conditions such as arthritis.
Bone spurs are largely responsible for limitations in joint
motion and can cause pain. The reason for bone spur formation is
the body is trying to increase the surface area of the joint to
better distribute weight across a joint surface that has been
damaged by arthritis or other conditions. Unfortunately, this is
largely wasted effort by our body as the bone spur can become
restrictive and painful. Bone spurs themselves are not
problematic, but they are a signal of an underlying problem that
often needs to be addressed. Bone spurs are often documented to
help assess the severity of a condition such as arthritis.

he [did] think that the Ultram has helped with the pain" (Tr. 404).

On August 16, 2007, Brent Peterson, D.O., examined Plaintiff for evaluation of neck pain, left upper extremity pain, and back pain. On neurologic exam, Dr. Peterson noted Plaintiff displayed significant pain behavior. He displayed breakaway weakness of all muscle groups of the left upper and lower extremity. Deep tendon reflexes were brisk at all stations in both upper and lower extremities. Hoffmann's sign[50] was present; and Tromner's reflex[51] was present bilaterally and two to three beats of ankle clonus[52] could be elicited bilaterally. Dr. Peterson's impression was neck pain and left upper extremity pain of uncertain etiology, with findings in his cervical spine on the right side at C5-6 and contralateral symptoms seen rarely; and reported arachnoid web at T4 of uncertain significance. Dr. Peterson was not certain that surgical intervention would be of benefit, but Plaintiff stated he was miserable and willing to try anything (Tr. 391-92).

---

[50]A sudden nipping of the nail of the index, middle, or ring finger produces flexion of the terminal phalanx of the thumb and of the second and third phalanges of some other finger.

[51]With the fingers of the patient partially flexed, the tapping of the volar aspect of the tip of the middle or index finger causes flexion of all four fingers and thumb.

[52]An involuntary tendon reflex that causes repeated flexion and extension of the foot. It may be caused by pressure on the foot or corticospinal disease. More than four beats of clonus is pathologic.

On September 5, 2007, Nancy Brecheisen, M.D., saw Plaintiff, and he was seeking clearance for neck surgery. Physical exam revealed diminished breath sounds. Chest x-ray showed changes consistent with obstructive lung disease without significant change from past studies. Plaintiff had recently been on antibiotics and was having pleuritic type discomfort and wheezing with distress. Dr. Brecheisen advised Plaintiff could not have surgery because of exacerbation of COPD. The doctor planned to put Plaintiff on Tessalon[53] and Levaquin (antibiotic) and then see him back in one week. If Plaintiff had not improved, he would need to be hospitalized for IV antibiotics (Tr. 291-92).

On September 17, 2007, Plaintiff returned to Nancy Brecheisen, M.D., and indicated his condition had improved, but the doctor still wanted to continue to wait on surgery. The doctor planned to set up CPAP in attempt to clear Plaintiff's cough and secretion production; do Medrol Dosepack (steroid) to decrease cough; use Levaquin (antibiotic) for several more days; and use Robitussin AC (narcotic cough suppressant) every six hours and continue Tessalon (non-narcotic cough medicine) at night (Tr. 289-90).

On September 21, 2007, Plaintiff reported to the emergency room worried that his blood pressure might be low (Tr. 324). Examination showed that Plaintiff's blood pressure was "quite

---

[53]Non-narcotic cough medicine.

satisfactory" (Tr. 325). Plaintiff lungs showed "a few scattered expiratory wheezes" but Plaintiff noted that he was not short of breath, nor did he have a cough (Tr. 325). Plaintiff was given antibiotics for persistent bronchitis (Tr. 325).

On September 24, 2007, Nancy Brecheisen, M.D., indicated that Plaintiff had improved, his lung disease was "nearly back to baseline," and he could proceed with the neck surgery (Tr. 288).

On September 26, 2007, Plaintiff met with Steve Buckles, D.O., for a pre-operative examination (Tr. 441-42). Dr. Buckles noted that Plaintiff's lungs were normal, stable, and clear to ascultation, and that Plaintiff could proceed to schedule neck surgery (Tr. 442).

On October 4, 2007, chest x-ray revealed mild pulmonary hyperinflation with no acute appearing abnormality (Tr. 323).

On October 8, 2007, Brent Peterson, D.O., performed an anterior cervical discectomy and fusion at C5-C6 with allograft and plate (Tr. 314). An x-ray the following day showed that alignment was normal and there was no instrumentation failure (Tr. 321). Following the surgery, Plaintiff reported that his arm and neck pain significantly improved, but he continued to have thoracic and lower back pain (Tr. 434).

On November 6, 2007, Plaintiff met with Brent Peterson, D.O. The doctor noted that Plaintiff was "doing well" and instructed Plaintiff to increase his activity level (Tr. 551). A cervical

spine x-ray that day showed anatomic alignment without
subluxation following cervical fusion surgery (Tr. 447).

On December 18, 2007, Plaintiff saw Brent Peterson, D.O.,
(Tr. 452). X-rays showed that Plaintiff's fusion was stable, with
no complications, and Dr. Peterson opined that Plaintiff was
"doing well" (Tr. 448, 452). Plaintiff asked about lower back
pain, and Dr. Peterson stated that he had no surgical options to
offer (Tr. 452).

December 31, 2007, is Plaintiff's last insured date.
Therefore, in order to be found disabled, his disability must
have occurred by this date.

On January 22, 2008, Plaintiff went to Steve Buckles, D.O.,
claiming that he had seen Dr. Makos for his back, and then went
to Dr. Peterson for cervical disc surgery, and they had told him
that something was wrong with his thoracic spine but "they
wouldn't touch it" (Tr. 445). Dr. Buckles noted, "I have no idea
what he's talking about NOR am I qualified to make a judgment on
this" (Tr. 445). On physical exam, Plaintiff weighed 283 pounds.
Motor exam demonstrated dysfunction with back spasm and pain. Dr.
Buckles assessed backache and intervertebral disc degeneration
(Tr. 445).

On January 30, 2008, Plaintiff went to Sean Clinefelter,
M.D., at North Kansas City Hospital Pain Management Clinic.
Plaintiff reported bilateral low back pain and right leg

pain,extending down the leg to the knee. Plaintiff also noted bilateral numbness and tingling sensations throughout both legs from the knees to the feet; and mid-thoracic midline back pain. Plaintiff reported his neck and arm pain improved after cervical discectomy and fusion in October 2007, but his mid thoracic and low back pain continued to be a problem. Plaintiff described the pain as throbbing and aching on an average a 7/10; at its worst 10/10; and at its best a 6/10. Plaintiff's pain worsened with bending, walking and reaching. Plaintiff was then taking Tramadol[54] for the pain. Dr. Clinefelter noted recent MRI revealed small lateral disc protrusion at L3-4 with some left lateral recess stenosis (narrowing). Plaintiff reported chronic shortness of breath, periodic weakness, depression, and anxiety. Physical exam revealed obvious discomfort rising from the sitting position; limited range of motion in the lumbar back secondary to pain; tenderness to palpation over the paravertebral muscles, and muscle spasms throughout the thoracic spine area. Reflexes were brisk in the patellar and brachial deep tendon reflexes in both lower extremities. Dr. Clinefelter believed there likely was a significant myofacial component to Plaintiff's chronic mid thoracic and lumbar back pain, but potentially a diskogenic component to the lumbar pain. The doctor recommended an epidural steroid injection in the lumbar area. The doctor thought if

---

[54]A narcotic-like pain reliever; same as Ultram.

Plaintiff's pain were improved, he could be a good candidate for physical therapy and physical rehabilitation. The doctor did not plan any interventional techniques in the mid-thoracic area and would recommend a second opinion by neurosurgery should that area continue to be problematic (Tr. 434-36). Dr. Clinefelter performed epidural steroid injection at L3-4 for lumbar radiculitis and lumbar spinal stenosis (Tr. 437-38).

In February, March, and April 2008, Plaintiff met with Steve Buckles, D.O., a number of times, complaining of a rash on his face and a cyst on his back, and asking about blood test results, refills of medications, and legal papers (Tr. 442-44). There were no reported discussions of COPD, and Plaintiff denied feeling tired or poorly (Tr. 443-44).

### C. *PHYSICAL AND PSYCHIATRIC ASSESSMENTS*

### 1. Physical Residual Functional Capacity Assessment

On May 30, 2006, a medical consultant, R. LaMar, performed a physical residual functional capacity assessment and listed Plaintiff's restrictions and abilities as follows:

1. Occasionally lift/carry 20 lbs;

2. Frequently lift/carry 10 lbs;

3. Stand and/or walk with normal breaks for a total of 6/8 hours per day;

4. Sit with normal breaks for a total of 6/8 hours per day;

5. Push and/or pull unlimited amounts except as listed above;

6.  Climbing ramp/stairs/ladder etc. frequently;

7.  Balancing frequently;

8.  Stooping only occasionally;

9.  Kneeling, crouching and crawling frequently;

10. No manipulative limitations (reaching, handling, fingering, feeling);

11. No visual limitations;

12. No communicative limitations; and

13. No environmental limitations[55] (Tr. 232-34).

The consultant concluded that "[t]he severity of claimant's statements is not consistent with objective findings. Statements are considered partially credible." (Tr. 235).

## 2. Psychiatric Review Technique

On May 30, 2006, a medical consultant, J. Singer, performed a psychiatric review technique and listed no medically determinable impairments (Tr. 236-48). The report, with original abbreviations replaced by their respective words, states that:

> Claimant alleges disability due to learning disability. He reportedly only completed the second grade due to frequent moving. Claimant states he taught himself to read. Claimant has consistently made over substantial gainful activity [employment]. Medical evidence of record in file does not support any mental developmental illness for allegations. At Neurological consultive examination dated May 23, 2006, claimant

---

[55] Although no environmental limitations are given here, the ALJ did establish that plaintiff should have environmental limitations due to COPD; limitations included non-exposure to fumes, smoke or other pollutants. (Tr. 11).

notes to be orientated in all areas with intact fund of
knowledge and normal attention and memory.

No established mental determinable illness for
psychiatric allegations. No further development deemed
necessary given neurological findings. Activities of
daily living information reported by claimant is not
significantly limited due to psychiatric allegation
(Tr. 248).

### D. *SUMMARY OF TESTIMONY*

During the May 6, 2008, administrative hearing, plaintiff

testified; and Janice Hastert, a vocational expert, testified at

the request of the ALJ.

### 1. Plaintiff's testimony

Plaintiff testified he was 47 years old at the time of the

hearing and has a second grade education. Plaintiff stated he has

been disabled since 2002. Plaintiff reported that he tried going

back to work but could not, and he ended up with pneumonia.

Plaintiff testified he worked in the past at a job peeling hot

dogs. Prior to that he was a smoke master, and before that he

milked cows (Tr. 19-22).

Plaintiff testified he had a stroke in 2002, and continues

to experience weakness in his left arm and leg. Plaintiff said he

frequently falls or drops things. Plaintiff said he uses a cane

(Tr. 23-25). Plaintiff stated he had shoulder surgery to repair

his right rotator cuff in 2003. Since then, Plaintiff's left

shoulder bothers him all the time.

Plaintiff stated his back has bothered him for years and has gotten worse in the last three to four years. Plaintiff reported that he had a disc replaced in his neck in October 2007. Plaintiff said it still bothers him, but not nearly as much as before the surgery (Tr. 25-26). Plaintiff described pain in his low back and said he has two deteriorating discs and one protruding disc, as well as something growing on his spine. Plaintiff testified that walking or any activity causes him back problems (Tr. 26). Plaintiff stated he also has trouble with swelling in his legs and feet (Tr. 30).

Plaintiff described breathing problems and said they have gotten worse. He said he has cut back on his smoking and was then down to one half pack a day. Plaintiff said he used to smoke over two packs a day but he cut back in the past year and a half. Plaintiff said he uses an ebulizer twice a day for breathing (Tr. 27, 33). Plaintiff stated that walking or talking makes him short of breath. Plaintiff testified he was told that he needs a CPAP after a sleep study because he stops breathing at night (Tr. 28-29).

Plaintiff stated he does not believe he could work at a sit-down job for 40 hours a week because he has to stretch during the day due to pain. Plaintiff estimated that he lies down for four hours during the day. Plaintiff said if he is unable to lie down,

he experiences severe pain and numbness in his legs, plus his hip will give out.

Plaintiff testified that his pain interferes with thinking and concentration, and makes him irritable (Tr. 29-30).

Plaintiff testified he takes pain medication and the medicine sometimes makes him feel "kind of off." Plaintiff's pain medication dosage was increased at the time of the hearing (Tr. 29-31).

Plaintiff estimated he could walk one half block with his cane and stand for five to ten minutes. Plaintiff said if he tried to stand longer than that, he would fall down. Plaintiff thought he could lift and carry 10 pounds, but he could not carry the weight very far. Plaintiff said he has trouble carrying things because he has to hold his cane. Plaintiff said he could sit for one hour, then he would experience numbness and tingling in his legs (Tr. 31-33).

Plaintiff said that he could not hold a job because he has to stretch out during the day (Tr. 29-30).

## 2. Vocational expert testimony

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge.

Ms. Hastert testified that Plaintiff has past relevant work as a skinner and as a poultry hanger (medium and unskilled) and as a smoke master (heavy and semi-skilled) (Tr. 35-36).

The ALJ posed a hypothetical question in which the judge assumed an individual who could perform work at the light level; could occasionally balance; but should not be exposed to concentrated amounts of fumes, smoke and other pollutants. The ALJ conceded that this would exclude Plaintiff's past work. The vocational expert replied that such an individual could perform other unskilled light jobs, such as bench assembler, hardware assembler, and garment sorter (Tr. 37).

In response to questioning from Plaintiff's counsel, the vocational expert stated there would be no available work if the ALJ's hypothetical was modified to include the limitation that the individual would need to recline for two hours during an eight-hour day (Tr. 37-38).

### E. FINDINGS OF THE ALJ

On June 27, 2008, the ALJ entered his decision on Plaintiff's application for disability benefits (Tr. 8-15). The ALJ made the following findings of fact and conclusions of law:

1. The Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2007.

2. The Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of November 1, 2002, through his date last insured of December 31, 2007 (20 CFR 404.1520(b) and 404.1571 et seq.).

3. Through the date last insured, the Plaintiff had the severe impairments of chronic obstructive pulmonary disease, cervical spine degenerative disc disease and mild lumbar spine degenerative disc disease (20 CFR 404.1520(c).

37

4. Through the date last insured, the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the ALJ found that, through the date last insured, the Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that would require occasional, but not frequent, balancing and would not expose him to concentrated fumes, smoke, or other pollutants.

6. The Plaintiff was judged a younger individual with a marginal education and no transferable skills.

7. The vocational expert testified that the Plaintiff has past relevant work experience as a skinner (medium exertional level), a meat smoker (heavy exertional level), a conveyor loader (medium exertional level), and a milker (medium exertional level).

8. When asked whether work exists in the national economy that could be performed by an individual with the Plaintiff's limitations and vocational profile of younger age with a marginal education and no transferable skills, the vocational expert testified that the hypothetical individual could perform a wide range of light work, including bench assembler, hardware assembler, and garment sorter.

9. For an individual limited to a wide range of light work with the Plaintiff's vocational profile, the Medical-Vocational Rule 202.18, used as a framework for decision-making, indicates that a finding of "not disabled" is appropriate.

10. Therefore, the Plaintiff was not disabled as defined in the Social Security Act, at any time from November 1, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(1)) (Tr. 10-14).

### V. CREDIBILITY OF PLAINTIFF

Plaintiff first argues that the ALJ erred in finding that his testimony was not credible.

Credibility questions concerning a plaintiff's subjective testimony are for the ALJ to decide, not the district courts. Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When an ALJ delineates inconsistencies that undermine a plaintiff's subjective complaints, and when those inconsistencies are supported by the record, the ALJ's decision should be affirmed. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004). An ALJ may make a factual determination that a plaintiff's subjective complaints are not credible when they are not supported by objective medical evidence in the record. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage,

effectiveness, and side effects of medication; and functional
restrictions. Polaski v. Heckler, 739 at 1322.

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> When the claimant has curtailed his extremely heavy
> cigarette smoking, he was noted to be "breathing fairly
> well." Despite his "persistent tobacco use," the
> claimant's chest x-rays and CT scans are largely
> unremarkable. Lung examinations generally show clear
> lungs. The claimant's physician wrote in April 2007,
> that his chronic obstructive pulmonary disease was
> "stable" (Exhibit 13F/6). The claimant has been worked
> up for his allegations of "numbness and tingling," but
> all tests show that he is neurologically intact. These
> allegations are without etiology (Exhibit 2F/36).

> As noted above, the claimant testified that his
> physicians told him not to stop smoking. However, the
> record shows that he has been counseled to stop smoking
> and told that his cigarette use exacerbates his chronic
> obstructive pulmonary disease. The claimant first
> reported that he drinks four to five beers daily or
> thirty per week (Exhibit 2F/42, 13F/23). Yet at some
> medical visits, he denied drinking any alcohol
> whatsoever.

> The claimant states that he has required the use of a
> cane since his "stroke" in 2002. However, medical
> records from that time show that the CT, MRI and MRA of
> his brain were all negative. None showed any evidence
> of an infarct. He told a physician that he required the
> use of a cane due to right leg pain that radiated from
> his low back. However, as discussed above, the claimant
> is neurologically intact with full motor power. Thus,
> there is no medical reason for him to require an
> assistive device.

> After considering the evidence of record, the
> undersigned finds that the claimant's medically
> determinable impairments could reasonably be expected
> to produce the alleged symptoms; however, the
> claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms are
> not credible to the extent they are inconsistent with

the residual functional capacity assessment for the reasons explained below.

(Tr. 12-13.)

A failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997). An ALJ may consider a claimant's exaggeration of his or her symptoms in drawing credibility conclusions. <u>Baker v. Barnhart</u>, 457 F.3d 882, 892 (8th Cir. 2006).

My review of the record supports these credibility determinations by the ALJ. For example:

There are numerous entries where Plaintiff was instructed to stop smoking and, despite such admonitions, he continued to abuse tobacco to the detriment of his physical health (Tr. 192-93, 220, 221, 223-24, 229-30, 295-96, 420-22). In October 2005, when Plaintiff was told to stop smoking, he indicated he would "take it under advisement." Moreover, the record shows that when Plaintiff made even a short-term effort to stop smoking, his lungs and breathing improved (Tr. 221, 294). In December 2004, when Plaintiff was not smoking, he was feeling well, he felt "markedly improved" since he had stopped smoking, and he only got short of breath if he walked fast. By mid-February 2005, however, plaintiff had resumed his pack-and-a-half smoking habit.

Plaintiff was repeatedly told by his doctors to lose weight, yet the evidence shows that he ignored this advice.

Plaintiff's complaints about pain and limitations from his spinal disorders are not supported by the medical evidence, which shows only mild degenerative disc disease (Tr. 267-68, 323, 343, 345, 391). Plaintiff's straight leg raising and motor power were found to be normal (Tr. 435), and his neck and arm pain had significantly improved after his discectomy and fusion in 2007 (Tr. 434).

Plaintiff complained about back pain to a neurologist who recommended epidural steroid injections, which Plaintiff rejected (Tr. 259).

Related to Plaintiff's smoking problems is his contention, despite all evidence to the contrary, that his doctors told him to continue smoking (Tr. 27). That contention flies in the face of all reason and common sense, is totally unsupported by the record, and therefore substantially detracts from Plaintiff's credibility.

The Plaintiff's complaints about numbness and tingling were tested and resulted in no etiology (Tr. 140, 177).

Similarly, Plaintiff's contention that his physician ordered him to use a cane as an assistive device is not supported by the record. Actually, the record reflects that *Plaintiff* reported to a neurologist, during a visit for back pain resulting from his attempts to remodel his house, that a physical therapist told him he needed a cane (Tr. 259).

The record includes other instances when Plaintiff's complaints of physical problems either went unsubstantiated by medical testing or were questioned: palpitations and chest pain thought to have been caused by Plaintiff's taking over-the-counter medication (Tr. 144); MRI of Plaintiff's brain to evaluate hyper reflexia (Tr. 262-63); Plaintiff's complaints of low blood pressure (Tr. 324); Plaintiff's complaints about his thoracic spine (Tr. 445).

In December 2006, plaintiff was hospitalized for pneumonia after he had stopped taking his steroids "but now he thinks he probably should have kept taking it because it probably was helping him some".

In addition, Plaintiff's daily activities do not support his allegation of complete disability. After his alleged onset date, Plaintiff was using a drill while working on wood (November 2006) and remodeling his home (June 2007).

Finally, Plaintiff's alleged severe back pain did not begin until after his last insured date.

Based on this record, I cannot say that the ALJ erred in discrediting Plaintiff's complaints of disabling medical conditions.

### VI. PLAINTIFF'S CHRONIC PULMONARY INSUFFICIENCY

Next, Plaintiff argues that the ALJ improperly determined that he did not meet the requirements for the listing for COPD at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A , prior to his date last insured.

On the issue of COPD, the ALJ wrote:

> The values of the claimant's valid pulmonary function test exceed the threshold for Listings-level respiratory disease. The claimant's representative urges that the severity of the claimant's chronic obstructive pulmonary disease meets the severity of Section 3.02A of Appendix I, Subpart P, Regulations No.4. However, this test on which this request was made was invalidated by the claimant's poor effort (Exhibit 13F/20, 14F/63). Moreover, this is but a single reading and must be viewed in light of the claimant's extremely heavy smoking. Therefore, the Administrative Law Judge cannot rely upon this test to find that the severity of the claimant's impairment meets the severity of a listed impairment. The claimant had a cervical spine directory and fusion at C5-6 in October 2007 (Exhibit 16F/3). After this fusion, the claimant no longer had cervical spine or upper extremity pain. He has a small bulging disc at L3-4, but negative straight leg raising tests, 5/5 motor power and normal sensation and reflexes (Exhibit 2F/12,/22, 16F/3). Accordingly, the claimant has no impairments of a severity to meet or equal the severity of any impairment contained in the Listing of Impairments at Appendix 1, Subpart P, Regulations No. 4.

(Tr. 11.)

An impairment must meet all of the listing's specified criteria. <u>Carlson v. Astrue</u>, 604 F.3d 589, 593 (8th Cir. 2010).

43

"Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively." <u>Caviness v. Apfel</u>, 4 F.Supp.2d 813, 818 (S.D. Ind. 1998). The plaintiff has the burden to show that his or her impairment meets the requirements of the listing. <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).

To meet the requirements for § 3.02A, COPD, spirometry testing must show that an individual of Plaintiff's height has a one-second forced expiratory volume (FEV1) of equal to or less than 1.55 liters. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. The spirometry testing report must also satisfy the testing documentation requirements established by 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E. To be used for determination of whether a Listing is met, an FEV1 measurement must represent the largest of at least three satisfactory forced expiratory maneuvers. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E. At least two of the values should be reproducible, meaning they do not differ from the largest value by more than five percent or one-tenth of a liter. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E. In addition, because the results are valid only if the individual being tested makes maximum effort, to be satisfactory, a pulmonary function report should include a specific statement about the individual's effort in performing the pulmonary function tests. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E.

There are two spirometry reports in the record here: the first on October 5, 2005, and a second on November 30, 2006 (Tr. 216, 375). The spirometry testing performed on October 5, 2005, shows an FEV1 of 1.75, well above the listing level (Tr. 216, 235); and reports "[a] good patient effort" (Tr. 216). On the other hand, the test performed on November 30, 2006, shows a listing-level FEV1 of 1.42, but indicates that the testing "was limited secondary to patient effort" (Tr. 375).

There is no explanation in the record for the difference in the two reports other than Plaintiff's effort (Tr. 216, 375) In addition, the ALJ observed that Plaintiff's test results were affected by his chronic heavy smoking (Tr. 11). As mentioned earlier, throughout the period of alleged disability, Plaintiff continued to smoke between one and two packs of cigarettes a day. Plaintiff's doctor opined that his COPD was secondary to and exacerbated by chronic tobacco abuse (Tr. 83, 219-20, 300); and Plaintiff's doctors repeatedly advised him to stop smoking (Tr. 83, 219-20, 223-24, 298).

Considering the questionable reliability of Plaintiff's single listing-level FEV1 test and his failure to stop smoking despite the admonitions from his treating physicians, the ALJ appropriately found that Plaintiff did not have listing-level COPD.

### VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Next, Plaintiff alleges that the ALJ erred by improperly assessing his residual functional capacity. Specifically, Plaintiff raises issues concerning his alleged obesity and his sleep apnea, along with his challenges to the ALJ's reliance on the opinions from the agency's consulting physician.

As to Plaintiff's residual functional capacity, the ALJ wrote extensively:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that would require occasional, but not frequent, balancing and would not expose him to concentrated fumes, smoke or other pollutants.
>
> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.
>
> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> The claimant has chronic obstructive pulmonary disease. However, he has smoked three and one-half pack of cigarettes per day for nearly 40 years (Exhibit 4F/l). He stated that he started smoking at age 6 or 7 (Exhibit 13F/23). The claimant has had a number of radiographic studies of his chest. In October 2003 the

46

claimant had a chest CT with contrast (Exhibit 2F/16). It showed no significant abnormality (Exhibit 2F/16). A chest x-ray taken at the same time showed "no obvious active disease" (Exhibit 2F/14). Chest x-rays in August and November 2004 showed clear lungs with no active pulmonary disease (Exhibit 2F/l0, 111). X-rays in November 2006 showed hyperinflated lungs, but no infiltrates or effusions (Exhibit 13F/16). An x-ray of September 21, 2007 showed possible early pneumonia, but there was no follow up.

Aside from the infrequent exacerbations of chronic obstructive pulmonary disease, which physicians ascribed to his tobacco addiction, when the claimant's lungs have been examined, they have been clear to auscultation (Exhibit 2F/2,/12, 3F/8, 13F/8). The claimant has improbably testified that his physicians have told him not to stop smoking because he would be in too much pain. However, the evidence shows that on multiple occasions, he has been advised to stop smoking because "every cigarette he smokes actually worsens his wheezing and shortness of breath" (Exhibit 13F/13, see also Exhibit 4F/6/7, 13F/6,/ 10-12). The claimant said that he was unable to stop smoking because his "nerves get shot" (Exhibit 13F/8). After having an exacerbation of chronic obstructive pulmonary disease in October 2006, the claimant stated that he was chain smoking because of pain (Exhibit 13F/12). In April 2007, after this exacerbation, the claimant told his physician that he was smoking only six to eight cigarettes per day and said that he felt better and had less secretions. The physician noted that the claimant was "breathing fairly well" (Exhibit 13F/6).

The claimant complained of cervical spine and upper extremity pain. Despite having cervical spine degenerative disc disease, the claimant was able to use buttons and small tools and parts and lift and carry (Exhibit 5F). After his discectomy and fusion in October 2007, the claimant no longer had cervical spine or upper extremity pain (Exhibit 17F/13).

The claimant has mild lumbar spine degenerative disc disease with a mildly desiccated disc at L3-4 (Exhibit 12F/10). This disc does not cause stenosis or canal or neuroforaminal narrowing. The claimant had a negative straight leg raising test with 5/5 motor power and normal sensation and reflexes (Exhibit 16F/3).

Second, once an underlying physical or mental
impairment(s) that could reasonably be expected to
produce the claimant's pain or other symptoms has been
shown, the undersigned must evaluate the intensity,
persistence, and limiting effects of the claimant's
symptoms to determine the extent to which they limit
the claimant's ability to do basic work activities. For
this purpose, whenever statements about the intensity,
persistence, or functionally limiting effects of pain
or other symptoms are not substantiated by objective
medical evidence, the undersigned must make a finding
on the credibility of the statements based on a
consideration of the entire case record.

The claimant alleges disability due to shortness of
breath secondary to chronic obstructive pulmonary
disease and numbness and tingling of the hip and legs
which "interferes with thinking."

The Administrative Law Judge finds that the claimant's
subjective allegations are not fully credible.
Therefore, they cannot be relied upon to find the
claimant more limited than shown by the objective
evidence of record (20 CFR 404.1529 and SSR 96-7p). The
undersigned notes that the claimant's hearing testimony
was non-responsive, self-serving and less than fully
credible.

(Tr. 11-12.)

## 1. Plaintiff's obesity

An ALJ is not obliged "to investigate a claim not presented

at the time of the application for benefits and not offered at

the hearing as a basis for disability." Mouser v. Astrue, 545

F.3d 634, 639 (8th Cir. 2008). Although a treating physician may

observe that a plaintiff is obese and should lose weight, obesity

need not be addressed unless there is some indication that the

condition imposes work-related limitations and restrictions on a

plaintiff. <u>Forte v. Barnhart</u>, 377 F.3d 892, 896 (8th Cir. 2004); <u>McNamara v. Astrue</u>, 590 F.3d 607, 611-12 (8th Cir. 2010).

Here, Plaintiff did not raise obesity in his various reports to the agency or during his administrative hearing. Therefore, Plaintiff's allegation that the ALJ failed to consider his obesity, while true, is not a basis for remanding the case or reversing the ALJ's decision.

### 2. Plaintiff's sleep apnea

As mentioned above, there is no requirement that an ALJ consider conditions a plaintiff has failed to bring to the judge's attention. As to sleep apnea, complaints of functional limitations resulting from the condition are inconsistent with a plaintiff's failure to seek treatment for the problem. <u>Long v. Chater</u>, 208 F.3d 185, 188 (8th Cir. 1997).

Here, Plaintiff failed to raise sleep apnea in his various reports to the agency and failed to allege any specific limitations resulting from the condition at any time. In addition, although Plaintiff was first diagnosed with sleep apnea on July 5, 2007, during his May 6, 2008, administrative hearing, Plaintiff testified that he had never been given a CPAP machine, as recommended, and was not pursuing the acquisition of such a device in the future (Tr. 28-29, 257-58). Therefore, the ALJ did not err by failing to include limitations from sleep apnea in arriving at Plaintiff's residual functional capacity.

### 3. Agency's consulting physician

Residual functional capacity is based on all the evidence of record. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001); Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000). The residual functional capacity formulation is a part of the medical portion of a disability adjudication as opposed to the vocational portion, which involves considerations of age, education, and work experience. Although a medical question, residual functional capacity is not based solely on "medical" evidence. Instead, an ALJ formulates the residual functional capacity based on all the relevant and credible evidence in the record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

Residual functional capacity is determined at step four of the sequential analysis, a point at which the burden of proof remains with plaintiff, and has not shifted to the Commissioner. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). A lack of significant restrictions imposed on a plaintiff by his or her treating physicians will support an ALJ's finding of no disability. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996). Here, Plaintiff does not cite to any specific part of the record showing that a treating physician determined that he was incapable of performing light work, and I am unable to find any from my own review. Furthermore, no examining physician found

limitations consistent with Plaintiff's complaints of disabling
conditions. Therefore, the ALJ did not err in formulating
Plaintiff's residual functional capacity and finding that
plaintiff can perform light work.

### VIII. HYPOTHETICAL QUESTION

Lastly, Plaintiff complains that the ALJ employed a
hypothetical question that was not supported by substantial
evidence in the record at step five of the sequential evaluation.
Specifically, Plaintiff complains that the ALJ failed to include
limitations resulting from Plaintiff's obesity and sleep apnea.

A hypothetical question need include only those impairments
and limitations found credible by the ALJ. Gragg v. Astrue, 615
F.3d 932, 940 (8th Cir. 2010); Heino v. Astrue, 578 F.3d 873, 882
(8th Cir. 2009).

Here, the hypothetical question posed to the vocational
expert was properly formulated because it included only
Plaintiff's credible limitations. As noted above, Plaintiff
failed to demonstrate that there were any work-related
limitations arising from his obesity or sleep apnea.

The ALJ determined that Plaintiff could perform light work
requiring occasional, but not frequent balancing, and not
exposing him to concentrated fumes, smoke, or other pollutants
(Tr. 11). In making this finding, the ALJ considered all of
Plaintiff's symptoms to the extent they were consistent with the

objective medical and other evidence in the record(Tr. 11). In response to the ALJ's question, the vocational expert testified that such a person could perform work as a bench assembler, a hardware assembler, or a garment sorter (Tr. 36-37).

There is nothing about the hypothetical question, its factual bases in the record, or the vocational expert's response that warrants a reversal of the ALJ's decision.

### IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, based on the above analysis, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


      /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 12, 2011